CITY OF AUSTIN, Appellant,

v.

John B. FLINK et al., Appellees.

No. 11676.

Court of Civil Appeals of Texas.

Austin.

May 28, 1969.

Rehearing Denied July 23, 1969.

H. Glenn Cortez, City Atty., Austin, Sears & Burns, Robert L. Burns, Houston, for appellant.

Les King, Austin, McKool, Jones, Shoemaker & King, Dallas, for appellees.

HUGHES, Justice.

This is a suit brought by the City of Austin against John B. Flink, Tina Flink, Carl E. Flink, Marjorie Flink, Alice and Charles H. Montgomery to condemn the fee title to 126.88 acres of land in Travis County for use for parks, playfields, camp grounds, golf courses, piers, wharves, a water reservoir and an addition to an electric generating system. The whole undertaking is commonly referred to as the Decker Lake Project.

Trial was to a jury and, upon its verdict, judgment was rendered for appellees for the sum of $69,647.00 ($548.00 plus per acre).

It was stipulated that all steps required to condemn this property were taken and that the only issue to be tried was the market value of the property on March 30, 1966.

Appellant has grouped its first eight points for briefing. These eight points complain of the admission in evidence testimony relating to eight specific sales of property as comparable sales. We will state the substance of the testimony concerning each sale about which complaint is made.

### Wattinger to Zale and Kruger

Witness John B. Flink: The date of this sale was 6–19–64. Size of tract, 146.5 acres; sales price $700.00 per acre.

Mr. Flink testified that the property was very comparable to his own; that the terrain is rolling as was his own; that the property was wedge shaped; that it lies on Highway 290, and that he took this into consideration; that it lies in the junction of U.S. 290 and a road in the Gregg community; that it is in the general area of his land.

Regarding his own property, Mr. Flink further testified that it was about three miles from the Austin City limits, the larger of two Decker Creeks came "catercorner" through his place which was a rolling tract of land in the sense that it was hilly and that the creek was dry except when it rained.

### Witness McDonald

The overall property is similar in topography to the Flink land, the fall of the

land and shape. It had considerable highway frontage. When asked about the effect of highway frontage on value, the witness testified about two similar property sales where the land with little or no highway frontage sold for more than one with a great deal of highway frontage.

### Witness Wilson

The land was triangular in shape, gently rolling, fronts on Highway 290, but this does not influence values, nor does the fact that land is in or outside a water district affect value very much. One tract outside a water district sold for more than a tract inside. This land is pasture land, unimproved and generally has the same description as the Flink land.

### Cedar to Farrell to Coffield

Date of sale 12–1–65. Acreage 125.24. Price, $800.00 per acre.

### Witness Flink

This sale was free and open; that this property was comparable to his own land and was about 1½ miles distant. It has railway frontage while his does not; that this property had no water line running in front of it. This sale was made after the City had publicly announced the Decker Project on December 22, 1964. Regarding this, Mr. Flink testified that he inquired of Mr. Cedar whether the announcement of the lake had anything to do with the sale of the property and he said he did not feel it had any bearing at all on it, because from his place he could not see the lake.

### Witness McDonald

The witness testified concerning this tract: It has a great deal of similarity with the Flink tract in many respects. It may not lay quite as well as the Flink land lays so far as future development is concerned, but it is a nice piece of real estate.

### Witness Wilson

The witness testified that this land was unimproved and that it lay outside the water district.

### Davis to Smith

*Witness Flink.* Date of sale 10–17–67. Acreage not shown. Price per acre $650.00.

The witness testified that this tract was about one mile northeast of his property; that the topography was similar; that its value was not enhanced by the lake project.

### Smith to Montandon

This was a re-sale of the property sold by Davis to Smith, the date being 11–9–67 and the price per acre being $850.00. Mr. Montandon told the witness that the lake had no bearing on the purchase. The witness testified that the sale was a free and open market transaction.

### Browning to Ross

Date of sale 5–29–67. Acreage 89.60, price per acre $760.00.

### Witness Flink

The witness testified that this acreage was due north of his property and borders on U.S. 290 and had some frontage on Decker Lane; that the topographical features of the property were very similar to his property; that the planned use of the property was residential; that it was a free and open sale with no trades.

### Witness McDonald

This witness testified: That he did not think the lake had a big influence on property values. The town was coming that way and the influence of the highway, the overall accessibility, the roads have been widened and paved since 1964, and the general development in the east and northeast sections of Austin have put values up on that property; people are clamoring for ground.

*Greinert to Keels to Coffield*

Date of sale 7–6–65. Acreage 90, price per acre $1,000.00.

### Witness Flink

The witness testified that this property had a few feet frontage on U.S. 290 and had railway frontage on the southeast; that it was comparable and similar to his own land; that the sale was an open market transaction.

### Witness McDonald

This witness gave additional testimony that the railway trackage did not affect the value of the property under the circumstances.

### Witness Wilson

This witness testified this tract was sold to Coffield 7–6–65; that the property was in the water district; that it was gently sloping pasture land, part having been in cultivation; that the sale was free and open.

### Sandstrom to Marshall

Date of sale 4–6–66. Acreage 37.89, price per acre $1,610.00.

### Witness Flink

The witness testified that this tract was rectangular and was similar in topography to his own; and about three miles distant; that the sale was free and open.

### Witness Wilson

This witness testified that this land was about three miles closer to Austin and this would influence its value more than the land of Mr. Flink; that the land was level bottom and is in the water district.

### Johnson to Mueller

Date of sale 2–23–66. Acreage 5, price per acre $1,600.00.

### Witness Flink

This witness testified the topography of this tract was similar to his own; that the sale was free and open; that it was made for investment purposes.

### Witness McDonald

This witness testified this tract "was not on what you would call a real through road."

Some of the above testimony was objected to and some was not. We will not distinguish between that objected to and that not objected to for the reason that we are of the opinion that it was all admissible.

The principal objections to testimony as to the sales above listed were that there was not sufficient similarity between the property the subject of these sales and the property being taken and that sales made after the project had been publicly announced by the City and after the actual taking of the Flink property were factually or necessarily enhanced in value by the project.

In addition to objections made to the above sales being admitted in evidence, appellant made a motion to strike the testimony as to sales made after the announcement of the project and after the taking based on the enhancement of the properties by the project.

The objection of lack of similarity or lack of comparability of these properties with the subject property is predicated mainly on the difference in size of the tracts, their location and distance from the Flink property, some being nearer to Austin than others, some being nearer to Decker Lake than others, some having frontage on U.S. 290, some having railway frontage, some being in and some being out of a water district, some having better or poorer access streets, and because of minor differences in topography.

Each of the appellees' witnesses testified that in their opinion the subsequent sales here complained of were not enhanced by

the Decker Lake Project and, further, that in this area the sales located on the highway were not selling for any more than those that were not located on the highway.

Mr. Flink testified that the highest and best use of his land was for "future development, subdivision, or residential" and that it was "investment" land. Although the Greinert to Keel tract had both rail and U.S. 290 Highway frontage, the witness testified that the "land use" for this tract was "planned residential."

Mr. Flink testified to the specifications of the fence to be built around the project. He stated that the market value of properties in the Decker Lake area were not enhanced because of the taking as was shown and indicated by the relative values of the "before" and "after" sales. He further testified that he knew to his personal knowledge that a fence was being constructed around the project area and that the sales here complained of were not enhanced by the Decker Lake Project because the lake could not be seen from them; further, the Davis to Smith to Montandon sales were not enhanced because of the fence around the project and, also, because of the abandonment of a portion of Blue Bluff Road. Mr. Flink described the road development taking place in the area and he gave the dates and the type of road development taking place in the area; and, he also stated that he could see no reason to adjust the comparable sales because of highway frontage. He further testified that Bluestein, a main artery in the area, and U.S. 290 enhanced the entire area.

Appellees' witness McDonald, testified that the City of Austin's master plan had set the Decker community up for future residential subdivision, and he pointed out the need for five to ten acre tracts and said that the subject property would have been advantageous for this sort of thing. He pointed out that the Cedar tracts with no U.S. 290 frontage sold for more than the Zale tract which had a great deal of frontage and, thus, the sales indicated that high-

way frontage had no influence on market value in this area.

We call attention here to the charge of the court wherein the jury was instructed "not to take in consideration any increase in value, if any, which may have accrued to defendants' land due to the Decker Lake Project." The jury was also instructed as to the use it could make of expert's second hand knowledge of sales testified to by them as a basis for their opinions as to market value.

■ It is an established rule that sales made after a project has been announced and after a taking may be used by an opinion witness in fixing the market value of the subject property where the market value of the lands involved was not affected by the public improvement for which the subject property was being condemned. State v. Williams, 357 S.W.2d 799, Tex.Civ.App., Texarkana, writ ref. n.r.e. (1962).

Here the project was announced in December 1964, the taking was March 1966, and the trial was in March 1968. During this period it is common knowledge that in addition to abnormal general inflation in values the City of Austin has had phenomenal economic prosperity. Mr. Flink was entitled to benefit from these conditions. He could not do so if appellant's objections to all sales subsequent to December 1964 were excluded.

■ We believe, under the evidence and under the instructions of the court, the City was protected from being compelled to pay for any increase in value of the Flink property due to the Decker Project.

■ As to the objection that these sales were not comparable we hold that this was for the trial judge to determine in the exercise of a wide discretion which he has in such matters and that no abuse of his discretion is shown. See Bruner v. State, 391 S.W.2d 149, Tex.Civ.App., Fort Worth, writ ref. n. r. e., cert. denied 383

U.S. 945, 86 S.Ct. 1200, 16 L.Ed. 207, (1965) and authorities there cited.

Appellant makes a special attack on the sales from Davis to Smith and Smith to Montandon, supra, on the ground that the sales were to some of the same grantees and hence was not an open market sale. Mr. Flink testified that the first conveyance was from Mrs. Davis to Smith, Journeay, Clark, Babcock and W. C. Montandon. The second conveyance was from the grantees just named to Frantz, Brooms, Prellop, A. C. Montandon, Journeay, Babcock and W. C. Montandon.

We do not know the details of these sales and from the bare facts shown we cannot say that the testimony that these sales were open market transactions has been overcome.

We overrule appellant's first eight points.

■ Appellant's points nine through twelve are jointly briefed. Point nine is that the trial court erred in refusing to permit appellant to question Mr. Flink as to whether he inquired, with respect to the sale of Cedar to Davidson, as to the effect which the Decker Project had on the parties to such sale.

This point is overruled. This question called for hearsay to be related as primary evidence. It was not propounded on cross examination to test the qualifications of the witness. Further, the record does not show what the answer of the witness would have been.

■ Points ten and eleven are that the trial court erred in refusing to permit the witness Montandon to testify that the Decker Lake Project had enhanced the value of the property in the area around such project and particularly the property which he and others had bought from Mrs. Davis.

Mr. Montandon was testifying and appellant asked him this question:

"Now what was the major contributing factor that led you to buy that piece of property?" (the Davis property) Upon appellees' request the jury was retired. When the jury returned appellant asked the witness, "Do you have an opinion as to what this property would have been worth if the lake had not been there the day you purchased it?" Upon appellees' objection that the witness was not qualified as an expert witness the objection was sustained.

While the jury was out, appellant interrogated Mr. Montandon for the purpose of making a bill of exceptions. We summarize his testimony there given:

In 1966 we secured an exclusive listing from Mrs. Davis to sell this land at $400.00 gross. Based on that he did not form any opinion concerning values in that area. We thought the land was a good buy at that price. We had no idea of buying it then. The Decker Project had been announced at that time. He had no opinion of what the value of the property would be if the project had not been announced. We thought that was a price the property probably could be sold for and that that was a price a willing buyer under no compunction to buy and a willing seller under no compunction to sell, would pay for the property. That he had no experience in this Decker area in 1964. If he had had a client looking for property in that area he would have ascertained the market value, but since he had no such client he did not. That in 1966 when he had the land listed, that is what he thought he could have sold it for, also, that that was what a willing buyer would pay and what a willing seller would take for the land. That the Decker Project had a considerable effect on the market value of property in that area. That the value of this property was influenced by the Decker Lake and also by the growth of the City east. As of 1967 and 1968 the witness had an opinion as to what a willing buyer would pay and a willing seller would take for property on Decker Lane and that the

value of this property was affected by Decker Lake over the past three or four years. In 1966 the witness did not know what improvements were to be put on Decker Lake except for the power plant and the recreation location; that he was not aware of any of the physical features of the Lake until the day before he testified; that one's opinion is altered by knowledge of the facts, and that he did not know all the facts relating to Decker Lake.

There is no evidence that Mr. Montandon knew the market value of the subject property on March 30, 1966.

Mr. Montandon testified that he did not remember talking with Mr. Flink about the Davis sale.

The ruling of the court on the bill of exceptions was that "this witness will not be allowed to testify before the jury as to enhancement. This witness has not been qualified for that."

We sustain the ruling of the court and overrule these points.

The testimony of an expert witness may be assailed by showing that he based his opinion on erroneous facts. This weakens or destroys his opinion.

■ The witness here testified that he was told by one of the purchasers of the Davis tract that the lake had no bearing on its value. This is a matter of substance to the expert. Had the information been that it had "some" bearing on its value, this would have been meaningless to the expert. So here, the opinion of Mr. Montandon that the lake influenced the market value of the Davis property is meaningless and of no value to the jury unless the witness is able to give an opinion as to the extent of this influence in the terms of dollars.

If the Davis sale was an open market transaction then its sale price per acre tends to establish a market value. The actual market value of the Davis property is not in issue and the testimony of the witness to establish this collateral issue was properly excluded in the discretion of the trial judge.

If a full dress inquiry is made into every sale used by the expert witness as a basis for his opinion of the market value of the property in suit in order to determine whether such sales were made at the then market value the trial of condemnation cases would be interminable.

■ In order to use sales of other property as bearing on the market value of the subject property it is only necessary to show reasonable similarity, that the sales were not compulsory but were free and open, not too remote and the price. It is not necessary to show that the price was its market value.

The qualification of an expert witness is for the trial judge and he has broad discretion in exercising it which will not be disturbed in the absence of an abuse of discretion. We fail to find any abuse of discretion by the trial judge in his ruling on the proffered testimony of the expert Montandon. Texas Law of Evidence, McCormick and Ray, 2d Ed., Sec. 1401.

Point twelve is that the court erred in giving the jury the following special instruction:

"Since the land under condemnation is within the boundaries of the Decker Lake Project, you are instructed that in arriving at your answer to Special Issue No. 1, you shall not take into consideration any increase in value, if any, which may have accrued to Defendants' land due to the Decker Lake Project."

The objection was that it was calculated to cause the jury to believe that the court is "doubly doubtful" that the increase in appellees' land due to the project did accrue, and objection was also made that the instruction did not state the date of the public announcement by the City of this project on December 22, 1964, it being contended in this respect and we quote from

the brief of the City, "that the failure to state the date was calculated to cause the jury to believe that the court intended it to include the increase in value to appellees' land accruing between December 22, 1964, and March 30, 1966, the date of taking, that the failure was calculated to cause the jury to believe that administrative or engineering investigations or reviews could supersede the official determination of the governing body of the City of Austin, and such failure allowed the jury to speculate as to how long after December 22, 1964, the enhanced value should continue to be included in their verdicts."

■ We overrule this point. The first "any" in the charge could have been omitted and the redundancy eliminated. We do not believe the jury was misled by this poor diction. It was held error not to give a similarly worded instruction in State v. Cartwright, 351 S.W.2d 905, Tex. Civ.App., Waco, writ ref. n. r. e. (1961).

■ The court's instruction was sufficient, we believe, to protect appellant from having to pay for any increase in value of appellees' land accruing from the Decker Lake Project. The date when this became a project by the City was not disputed and was clearly reflected in the record in numerous ways. If there was error as asserted, it was harmless. Rule 434, Texas Rules of Civil Procedure.

Appellant's points thirteen through seventeen are jointly briefed.

Point thirteen is that the court erred in admitting in evidence an affidavit made by Mrs. Ethel Davis and point sixteen is that the court erred in overruling its request to excuse the jury when the admissibility of this affidavit was argued, this for the reason that appellees were thereby permitted to convey to the jury the substance of · the affidavit.

Points fourteen and fifteen are that the trial court erred in striking the testimony of Dorman, Beck, Jedlicka and Perkins regarding the sales from Davis to Beck and Davis to Dorman and in refusing to permit the witness Legge to testify regarding such sales.

Point seventeen is that the trial court erred in permitting the cross examination of appellees' witness Barnes by reading questions and answers of Mrs. Davis regarding her financial condition when such questions and answers were not in evidence.

The affidavit of Mrs. Davis, one of the grantors to Dorman, Beck, was to the effect that for several months prior to those sales her husband, the other grantor, was in bad health, that their savings were depleted, they were in debt and the lands had to be sold in order for them to live. In other words, that the sales were distress sales.

There was testimony from some of appellees' witnesses that the sales in question here were free and open; the basis for this testimony being, primarily, conversations with Mrs. Davis.

The record also shows that by questions propounded by attorneys for appellees the jury was indirectly advised of the contents of the affidavit of Mrs. Davis.

■ The principal question, it seems to us, is whether the trial court had the authority to consider the affidavit of Mrs. Davis for the purpose of exercising his discretion in allowing proof of these sales as relevant to the expert's opinion as to market value of the subject property. Since hearsay is admissible to show that a sale is open and free in order that such sale may be used by an expert in forming an opinion as to value, it would seem logical and fair that hearsay could also be used to show the contrary in order to disqualify such sale. If the Davis affidavit was properly before the court for the purpose of guiding him in his discretion in this matter, then there is no doubt in our minds that he properly exercised such discretion. In 31A, C.J.S. Evidence § 210

it is stated that the hearsay rule is considerably relaxed where the evidence is addressed solely to the judge to enable him to determine the exercise of discretion. It seems to us that the sworn statement of Mrs. Davis as to why their lands were sold is much more reliable hearsay than the second hand statement of witnesses as to what she told them.[1]

In State v. Scarborough, 383 S.W.2d 839, Tex.Civ.App., Texarkana, writ ref. n. r. e. (1964) it was held in a condemnation suit that exclusion of hearsay testimony as to certain sales transactions offered to sustain the appraiser's qualifications to express an opinion as to the value of the subject property was not prejudicial where the appraiser was shown to be fully qualified and such testimony was purely cumulative. The record here shows that Mr. Legge was fully qualified to express an opinion on the value of this property and that he used numerous sales as a basis for such opinion.

It is our opinion that the trial court did not abuse his discretion in striking testimony as to the sales in question. We overrule points thirteen through seventeen.

Point eighteen is that the trial court erred in refusing to permit the witness Legge to testify to the circumstances and price of the sale from Roan to Murchison to Peak and in considering an exhibit relating to an income tax liability of Roan to the Federal Government in so ruling.

Mr. Legge testified that he talked with the purchasers of these tracts but did not talk with the Roans to ascertain whether they had to sell the properties and that he knew of nothing to indicate it was a hardship sale, and that Murchison had stated that it was an open market transaction.

There were three sales to Peak which are involved, one of 20 acres and one of 68 acres from Roans to Peak and one of 60 acres from Murchison to Peak. The sale from Murchison to Peak was admitted.

The tax record was not admitted in evidence for the purpose of enabling the court to rule on the admissibility of the Roan sales and we are of the opinion that the court erred in this respect. Under the circumstances, to be stated, we are of the opinion that this was harmless error.

Out of the presences of the jury the following occurred:

"THE COURT: Was there a separate sales price on each of these three tracts?

A No; the sale from Murchison to Peak was $250.00 an acre.

THE COURT: On all of it?

A Yes.

Q But you don't have a sales price on the 60.65 acres?

A Yes; on that particular piece of land the sales price was $204.45 per acre, and of course in verifying this —in talking to Murchison he was thinking of the whole deal—the entire tract, and he said the total price was $250.00 on the whole thing; but this particular tract was $204.45."

Upon appellees repeating a waiver of objection to the 60.65 acres, the court stated that it would be allowed and "you may question the witness concerning that, and that tract only."

1. In this regard the trial judge stated, "* * * It would appear to the court that this statement where it has been proved up by the person who notarized the document, and it is now offered in rebuttal, it would appear that this statement which was sworn to and the affiant signed the document in the presence of a notary public here at present time to testify, certainly such evidence should be considered by the court and should bear as much weight as the testimony of an expert witness who says that he confirmed the sale, which is strictly hearsay, and of course, an exception to the hearsay rule."

The jury returned to the courtroom and Legge testified that the property sold for $12,400 or $204.45 an acre.

 The sales which were excluded were sold for higher price per acre than the sale which was admitted. It was to appellant's advantage to show the smallest value per acre. We know that the more low priced sales per acre which are shown the better it is from appellant's point of view. We also know that if this case is reversed for the exclusion of these sales that on retrial they would also probably be excluded on the ground that they were made to satisfy a very large tax liability and under compulsion. Under these circumstances, we hold that the error in excluding these sales is harmless under Rule 434, T.R.C.P.

Point nineteen is that the trial court erred in permitting appellees to cross examine the witness Legge on certain statements of one Laws at the hearing held by the Special Commissioners, such statements not being in evidence and which was calculated to give the jury the impression that Legge had permitted Laws to use his appraisal report.

Mr. Legge was being questioned on cross examination as to whether he had made more than one appraisal of the subject property and he answered that he had only made one appraisal.

He was then asked the following question:

"Q Now, Harold, there has been testimony that your appraisal was used by another appraiser in determining his opinion of market value."

The following colloquy between counsel for appellant and the court occurred:

"MR. CORTEZ: Your Honor, we don't recall any such testimony of that sort.

THE COURT: Do you wish to make an objection?

MR. CORTEZ: We don't recall any such statement to that effect in the record of this trial.

THE COURT: Of course, I don't know anything about it either. Do you wish to make an objection?

MR. CORTEZ: My objection is— he says that there has been testimony to that effect, but we don't know where the testimony come from or what the source of it is."

This objection was overruled.

Appellees contend that this question was asked in order to lay the basis for impeaching the statement of the witness that he had made only one appraisal.

 It is our opinion that the objection made by appellant was too vague and indefinite to apprise the trial court that the real objection to this question and subsequent questioning not made the subject of other substantive objections was that it called for hearsay testimony. For this reason we overrule point nineteen.

Point twenty is that the trial court erred in rendering judgment against it because the verdict of the jury is against the overwhelming preponderance of the credible evidence as to be manifestly wrong and unjust.

 This point is overruled for the reason that it is not adequately briefed. Appellant states that to properly brief this point would unduly extend the length of the brief. This Court should not be called upon to review the entire record when appellant refuses to do so.

Remaining points twenty one and twenty two, jointly briefed, are that the trial court erred in refusing to hear the testimony of jurors Baker, McCann, Sparks, Burke and Dodson at the hearing on Appellant's Amended Motion for a New Trial on the issue of disqualification of Lorena Baker and Edgar McCann as jurors and on the issue of misconduct of the jury during voir dire and deliberations.

Appellant's Amended Motion for New Trial moved for a new trial on the grounds that the jurors Lorena Baker and Edgar McCann were disqualified as jurors, that such jurors were guilty of misconduct during voir dire examination, and that the jury was guilty of misconduct during its deliberations. Attached to the Motion were the affidavits of the jurors Baker, McCann, Sparks and Thompson. These affidavits were sworn to by the jurors before H. Glenn Cortez, a Notary Public and an Assistant City Attorney of Appellant. At the hearing on October 30, 1968, all jurors except Mrs. Thompson were present in the courtroom.

At the beginning of the hearing appellees made an oral motion to quash the affidavits on the grounds that they were (1) taken by an attorney of record in the case and (2) they were insufficient to allege any acts or misconduct.

The trial court sustained the Motion to Quash on both grounds and refused to permit the five jurors to testify.

We quote from the affidavit of Miss Baker:

"On the first ballot I was high at $800.00 an acre. I told the jurors that I arrived at this figure by averaging the sales which were presented to us.

I told the jurors that the Flinks should get well paid for their property since they did not want to sell and that if he were allowed to hold on to it for a period of time it would undoubtedly be worth considerably more than it is now. I based my original opinion of $800.00 on some of the sales which had taken place out there and which were presented and I told this to the other jurors. * * *

Although Mr. King's fees were mentioned, we did not know how much he was going to get and I felt sorry for Mr. Flink having to give a large amount to his attorney in the case.

At the time that I was asked questions by the attorney before the trial began, I had received a letter from the University of Texas informing me that my property would be taken by the University. I indicated to the other jurors that I had received such a notification that my property would be taken by the University of Texas. Mr. McCann also said during the deliberation that he had property which was going to be taken for Mo-Pac and that he would ask $40,000.00 for it.

On the second ballot I came down from $800.00 to $600.00 an acre but Mr. McCann stayed at $800.00 where he had started. When he found that I had come down to $600.00 he said 'Oh, you shouldn't have done that.' But I realize that perhaps I was too high and that we had to come to an agreement. Mr. McCann stayed at $800.00 on that round and then we kept on being deadlocked and the others said we will have to reach a compromise.

When the attorneys were asking questions of the jury panel before the trial began, I recall having been asked whether or not I had ever been involved in a condemnation proceeding or whether I was presently involved in condemnation or anticipated that I would be involved in condemnation, or knew of any situation or matter which might bring me into contact with condemnation. I did not respond to that question because the letter which I had received from the University was all that I had received and it did not contain any details. I felt that it was in the future and that I did not know enough about it to respond to that question.

From what I heard about the affidavit of Mrs. Davis, I felt that she needed the money and made the sales because of her need for money, although I do not feel that she was destitute. I think the City bore down a little too heavy on her in trying to pretend that she did not need the money and she probably did need it."

The letter from the University, dated October 25, 1967, attached to this affidavit advised Miss Baker that her property was needed immediately by the University and that unless terms were agreed on the University would institute condemnation proceedings.

We quote from the affidavit of Mr. McCann:

"In response to questions by the attorneys before the jury was selected, I indicated that there was no reason that I knew of which would cause me to be other than fair and impartial to both parties involved in this law suit, and that I was not involved in any land acquisition by any authority having the power of eminent domain, nor did I know of any matter which would cause me to be involved in any such condemnation matter.

After having heard the evidence presented by both sides in the trial, the jury retired and I was selected as foreman of the jury. At my request Mrs. Thompson, another member of the jury, read the charge to the jury and we commenced deliberations regarding the value of the Flink property. On the first ballot which was taken I started out at $650.00 an acre plus $4,000.00 for the improvements on the property. Miss Baker, another juror voted on the first ballot for $800.00, what the man wanted. The figures on the first ballot ranged from $400.00 up to $800.00 per acre. In arriving at the figure of $650.00 an acre I pointed out to the other jurors that a tract of land had sold for $1,000.00 an acre and that therefore $600.00 would be about right for the Flink property. Of course we all discussed in addition to that $1,000.00 sale the other sales which were presented and they had a bearing on our final outcome. Another sale that we felt was important was the Davis to Montandon sale for $850.00 an acre. Although I thought that he should get $650.00 an acre, $550.00 an acre was as high as I could get the rest of the jurors to go."

We also quote from the affidavit of Mrs. Thompson:

"I believe that on the first ballot Mrs. Burke and Mrs. Sparks came in at $500.00 like me and that Miss Baker came in at $800.00. Miss Baker told us that her house was scheduled to be taken by the University. During deliberation Mr. McCann was set at $600.00 an acre and we were having a difficult time in getting him to come down to our $500.00 figure. In an effort to break the deadlock I told them that I would be willing to give $50.00 if he would give $50.00 and we then agreed to compromise at the $550.00 an acre. Also Miss Baker during this deliberation lowered her figure to Mr. McCann's $600.00 after she saw that he was not going to go any lower than $600.00. She indicated that she felt sorry for the Flinks and wanted them to have all they could get. I feel that Miss Baker based her $800.00 an acre largely on sympathy which she had for the Flinks and which she expressed to the other members of the jury. We all talked to her concerning her expressions of sympathy and she finally dropped her value to Mr. McCann's value at which time we felt that she would go along with whatever Mr. McCann agreed to do. In other words, she and Mr. McCann stood pat at $600.00 and we had a very difficult time in getting Mr. McCann to come down to $550.00."

From the affidavit of Mrs. Sparks we quote:

"On the first ballot I voted to give $500.00 an acre to Mr. Flink, however two of the members of the jury had voted to give him $750.00 an acre which I felt was too high. We talked about the fact that Mr. Flink was not anxious to sell his property but that he would rather have kept it and that therefore the City should pay him more than the offer which it made to him, especially since he did not want to sell the property. We just felt like in all fairness that Mr.

Flink should have more for his property since he was having to sell.

The amount that Mr. King was being paid for representing the Flinks was mentioned in the jury room and we felt that he was getting a fair share, although we did not know what percentage he was to receive.

Although I believe that $550.00 an acre was too much, I did agree to that figure when one member of the jury indicated that if we did not compromise that we might be there for one more week, therefore I agreed to go up $50.00 if they would come down to $550.00.

Some of the other jurors indicated that they were influenced to a large extent by some of the sales of property which had sold for so much, some of it for $1,000.00 an acre, but those sales did not influence me. Some of those jurors said that if the property was that much now that why shouldn't the Flinks have their property valued at that amount.

A member of the jury, several times during the deliberations, told us of her thoughts that the Flinks should get what they wanted since this was being taken from them without their agreement. She also expressed the thought that she felt sorry for them and that they looked like they needed the money."

It is not necessary that we decide whether an attorney for appellant was disqualified to act as a notary public in the making of these affidavits. We believe the better practice to be that the attorney not so act under the reasoning found in cases holding that an attorney in the case is disqualified to act as a notary in taking depositions. Clegg v. Gulf, C. and S. F. Ry. Co., 104 Tex. 280, 137 S.W. 109 (1911), Ryburn v. Moore, 72 Tex. 85, 10 S.W. 393.

It is our opinion that the affidavits were insufficient to require the trial judge to hear the jurors. They do not show material jury misconduct sufficient to show

an abuse of discretion by the trial court in not hearing the jurors.

Expressions of sympathy by jurors for persons whose property is being condemned is improper but are not calculated to bring about a biased verdict. Everyone, we assume, has sympathy for anyone who is being evicted from his home just as everyone, we assume has sympathy for a man seeking damages for a broken back. These sympathies, however, do not bar such persons from our Courts. Trust in our jury system and confidence in the fairness of jurors must be relied on to overcome the effect of natural and human sympathy for one of the litigants.

That one of the jurors stated that his property was to be condemned and that he was going to ask $40,000.00 for it was certainly improper, but how could it affect the verdict in this case? For all the statement reveals this asking price might be below its market value. There is no relation shown between the property referred to by the juror and the subject property. How much property the juror had is not shown. It is shown, to those familiar with Austin, that the property referred to by the juror is in West Austin whereas the subject property is east of Austin and that the two properties are many miles apart.

The mention of attorney's fees was apparently casual and not calculated to result in an improper verdict.

Miss Baker's reference to the Baker affidavit was not material. As shown above this affidavit related to a sale which was excluded by the court.

All other statements in the affidavits are, we believe, but references to routine discussion and debate between jurors or to the mental processes of the jurors except the statement by Miss Baker as to her noninvolvement in condemnation proceedings. On the new trial hearing the attorney who conducted the voir dire exam-

ination of the jury panel for the City testified:

"Q In the statement signed by Miss Lorena Baker where it says, 'When the attorneys were asking the questions of the jury panel before the trial began, I recall being asked whether or not I had been involved in a condemnation proceeding, or whether or not I was presently involved in a condemnation, or anticipated that I would be involved in a condemnation or knew of any situation or matter that might bring me into contact with condemnation,' did you ask such a question yourself?

A I asked a question of that sort. I don't recall exactly the exact statement that was made.

Q Wasn't the question asked at the time of the voir dire of the jury if any of them were involved in condemnation at that time, or had been involved in condemnation, and didn't Mrs. Thompson hold up her hand that she had been involved in condemnation?

A The question was along that line. As I said, I don't recall the exact phraseology used. I do recall a number of the panel raised their hands, and perhaps Mrs. Thompson was one. I remember one Mr. Means raised his hand, and there was a Mr. Collum, I believe he raised his hand.

Q Did you ask the question yourself, and would the record reflect that you asked the question yourself, as to whether or not they knew of any situation or matter that might bring them into condemnation?

A As I said, I don't recall the exact question that was asked. I recall asking a question concerning involvement with condemnation, and the exact terminology used, I just don't recall. I looked for my notes, and have been unable to find them.

Q So your records themselves do not reflect that you asked the question as to whether or not they might be involved in future condemnations?

A My records do not reflect one way or the other."

█ It is our opinion that the City failed to show that it had sufficiently examined the panel on voir dire, particularly Miss Baker as to her involvement in condemnation matters. She states that she was asked about anticipated involvement in condemnation proceedings but she stated that she felt the letter received from the University "was in the future," and that she did not know enough about the matter to answer the question. It was incumbent on appellant to ask questions of such clarity and directness that the panel could not fail to understand. The record does not show that this was done. See Tudor v. Tudor, 311 S.W.2d 733, Tex. Civ.App., Amarillo, writ ref. apparently n. r. e., 158 Tex. 559, 314 S.W.2d 793 (1958).

Finding no reversible error, the judgment of the trial court is affirmed.

Affirmed.